Petitioner's argument is, Your Honor, that he has already been adjusted status by Homeland Security in Sacramento. Oh, so this is something new? The problem is jurisdiction, Your Honor. There is a deportation order that needs to be vacated so they can give him green cards. They have already given him the work permit based on his approved labor certification and approved employee petition. Well, look, we have three separate petitions in front of us for review. Your Honor, it took six years for the labor certification approval and the employee petition approval. In those six years, we had to reopen this case twice because the Board of Immigration So the government is slow, Your Honor. I understand. All of us will agree with you that the government can be slow in these cases. And Congress, Your Honor, passed this LIFE Act 245i. He filed labor certification before April 30th, 2001. So Congress says you're right. We are very much aware of the labor certification proceedings. But the problem is, is there's an order of removal on the books. And you want us to set aside one of these decisions by the BIA. Your Honor, when he was in asylum hearing before the judge in San Francisco, immigration judge, if labor certification could have been done in one week, we could have complied with the 90-day window with the motion. Don't you have to? Why don't you start with the first petition and deal with the adverse credibility finding? Your Honor, the first petition is the denial of asylum. Right. Now, if he had been granted asylum, then you wouldn't have to worry about the labor certification, right? Your Honor, I have the timetable right here. He was deported by the immigration judge in 1999, and we filed for labor certification right then. But we understand that. We understand the whole business. The first petition arises from the denial of his asylum application. Yes. And the immigration judge said, I don't find the petitioners credible. Therefore, I don't believe them. There's not sufficient evidence to support their asylum application. Petition, application for asylum, withholding, everything else, denied. That went to the BIA. They affirmed it, and it's now before us. So the question for you that we're asking is, what's wrong with the adverse credibility finding? I'll do that, Your Honor. I'll explain that. I was the trial attorney during the asylum merits hearing, and here is what happened. We have husband and wife. They were both joint asylees on this. So they put the husband outside, they brought the wife in, asked her for the arrest dates. She's not educated, Your Honor. She cannot remember the dates of arrest. And so they want the dates to be memorized right to the date, time, everything. So we got the actual arrest record from India and showed it to the judge, but the Board of Immigration, we would not look at these arrest records. We had the exact dates. There was no misrepresentation. It's just that they could not remember the dates of the arrest. His wife could not remember the dates. When you say you showed it to them, did you put it in the official record, or did you just send them a letter with it? We filed it. We submitted it to BIA, the actual arrest record from India certified by the police. After the hearing was closed? Yes. Because the judge would not continue to do it. Now we open the hearing and the I.J. did not consider it, right? All in the record, Your Honor. Okay. Did you ask the BIA, here's some new evidence, send this back to the I.J. so the I.J. can consider it? Yes. Yes, Your Honor. And did they ever rule on that? No. They just disregarded it. They just did not do that. I have a thought. You can have all your time, but why don't you reserve it for now and let us ask the government some questions. Thank you. Counsel. Good morning, Your Honor. This is Benton Peterson for the respondent. Are you with the DOJ or are you a U.S. attorney? I am an assistant U.S. attorney, Your Honor. You're an assistant U.S. attorney? Which part of the country are you from? I'm actually from Washington, D.C. Okay. You're going to fall over the United States. Yes, it's pretty amazing. We've seen a lot of AUSAs here this week on these kinds of cases. This is actually a procedural mess. And the merits are such that it, I mean, it. We don't know. Well, it's just a mess. I mean, there seems to be, just talking for myself, I find problems with the adverse credibility decision to start out with. There is, they did try to get evidence of the arrest records before the BIA, however, ineptly. There is this labor certification, and now I understand there's a question of U.S. citizen children as well. Is there any way the government would consider, you know, I know they have a mediation program going. I mean, putting this to mediation and trying to work this thing out, because this, I mean, it's been a long time. It's been a series of procedural messes, and I know you may not have complete authority to speak on this issue, but what could you say about it? Yes, I think, Your Honor, you touched upon the key issue here. I personally do not have the authority to offer that or to extend that offer at this point. You know, of course, should the court want us to do that, in some capacity we would, I would definitely take that back and we would comply with the court's order in that regard. Would you personally prefer that if we were to pursue the course, you would want to do mediation within the Immigration Service or Homeland Security, whoever's got it now, or would you want to come to the Ninth Circuit mediation process? I believe it would be within the immigration process, Your Honor. That's what we'd prefer. Then you could stay in Washington and deal with it.  That would be preferable. Okay. The Immigration Office, though, has lately been indicating to our court that there were certain cases where certain equities that they do, they can mediate by phone with the Ninth Circuit mediator. They've been, well, I think several cases now. Okay. I just got notice of one today that had been mediated to a favorable result. Well, I'm sorry to disagree. You're here as a volunteer, are you not? Yes, I am. Okay. I mean, the service is so under water, they requested help any way they could get it in the government, and you volunteered. That is correct, Your Honor. We appreciate that. Thank you, Your Honor. Thank you, Your Honor. And I'm sure that there is some flexibility with regard to participating here in the Ninth Circuit mediation program versus the D.C. program. If the court should prefer to have, if the court decides that's something appropriate, and then if the court should want that to take place, I'm sure there's some flexibility in that arena. Do you think our suggestion makes any sense? I don't reason. I'm not asking you to make a commitment, but. Well, I do, Your Honor, in that sense. I do, I think it makes sense for that to have happened further up the road. At this point, there are so many machinations in place, and for the lack of a better term I've been given my marching orders to defend the board and their decisions in this case. And on the other hand, I do believe that there are some reasonable grounds for the IG's decisions and for the board's decisions not to reopen. I always find the AUSAs are more flexible in talking to them than the, you know, immigration attorneys that they send out here. So, okay, I think we should consider sending it to Ninth Circuit mediation and trying to work something out rather than rolling on the three separate petitions. And should, I don't know exactly how to. No, maybe we should just go ahead and hear him. Let's hear his argument. Let's hear his argument on the. Asylum, let's start with asylum. So Judge Wardle indicated that she has a problem with the credibility finding, and, you know, I would like to hear the government's response to the IJ's credibility determination. Yes. Specifically with regard to that, these are not just about dates and rote memorization. What you find in the transcript is questioning with regard to a sequence of events. These events happened just previous to a few years before the actual hearing, but they were events that are the only events that made up the crux of the application of why the applicants, the aliens, sought asylum and withholding from removal. They surround three arrests, and those three arrests became crucial. They were the only hooks or holes that the immigration judge could hold onto in order to assess the credibility of these particular aliens. So in that search, the immigration judge was careful in trying to determine the sequence of events, not necessarily the exact dates, but how they happened, how they occurred, and what type of consistency could the immigration judge find among the witnesses that were presented by the aliens. Now, in that regard, you have the first arrest, which took place in October of 1990 in a farm, the raid in the farmhouse. The petitioner, excuse me, the alien indicates that there were seven members in a farmhouse, that there were three shot and killed, and that police officers were killed, and that at one point there was a witness who said that the petitioner, one of the alien, Mr. Jassy's leg was broken at that point. But then again, you have another witness, the wife, indicating that the leg was not broken in October of 1990. It was broken at a later date in November of 15th. These are not about rote memorization, but it's about how the story fits together, because part of the rationale or the story of the petitioners or the aliens in this case is that at one point he had to have the assistance of another person to help him escape arrest, in that sense, because the leg was broken, and he needed to find some sort of escape into the fields before the police were to detain him. The timing of that just doesn't work out, given the fact that there are three different stories about exactly when the leg was broken, and how the petitioner, in this case Petitioner Jassy, escaped arrest at this point. So with three different stories about one incident, it provides kind of a window in which the immigration judge had to look through in order to assess any credibility at all. Otherwise, without testing the story in some form or fashion, the immigration judge had no way to determine the credibility of the actual claims that would have substantiated an asylum or withholding of removal. There are other instances with regard to the other arrests. The other arrests indicate that there were beatings that took place while in the initial application for asylum, there were indications of beatings that took place with regard to one of the petitioners, and how in that instance there were several moments with the police that caused them injuries. And that's in the initial application. Now, in that initial application, especially with the wife's initial application, there is no mention of Petitioner Jassy's broken leg at all. Now, this doesn't require any educational background. This doesn't require any type of experience except worldly experience to know when your husband's leg was broke. And that's the kind of information, and that's the only information the immigration judge had to lean on in order to assess the credibility of these particular witnesses. The problem is, you know, what you're doing is going through the I.J.'s statements of why he disbelieved the Jassys, and that we're not talking about the law, particularly in the Ninth Circuit, that applies to each one of these findings. And so, some of the law is such that you can't, it's impermissible for the I.J. to speculate. And, for example, on the cast thing, the I.J. is speculating whether or not he could really, you know, hobble away if he had a cast and he had crutches. And there's some explanation, there's also explanation in the record that the cast could have been below the knee and he ran away, he'd already been wearing it for two months. And so, under the law that applies to these kinds of findings, that that would be not an appropriate finding. And there's a number of other legal type issues that, you know, the I.J. has to deal with. And I'm not going to go through this. In addition, if you look at, what is it, the type of evidence that the State Department country report says, a list for what a credible SEEK application should include, and that's in the record at 407, Jassy and Carr's applications include all of that evidence. All of that type of evidence. And there are also translation errors that, you know, we've held that translation errors, you know, that you kind of have to recognize when there's translation errors and try to discern what was being read, but you can't base the average credibility on what is obviously a translation error. Well, the issue with that, Your Honor, is that the instances that I tried to highlight were the instances where there weren't, at the time, the transcription, if you read the transcript, there wasn't any indication of an error being made after the fact. There may have been allegations that there were transcription or interpretation errors with regard to what was being read. When Mr. Jassy was arrested and when exactly he had a cast on his leg. Not necessarily dealing with how he escaped a particular arrest, but just the existence of a cast, the existence of an arrest, whether he was free or whether he was under police custody, and the sequence of those events for the three arrests, I think those are things that they don't call for the IG, or the IJ, excuse me, to speculate or to provide any other reasons that are not there. He sees that these stories don't match, and he has to make a determination whether it's reasonable that these stories not matching indicates that there are problems. There's a lie of consistency if you look at all the stories. He cited three grounds. He cited girls' testimony, he just discounted all together. Then the second ground was discrepancies regarding the faction of the All India Sikh Student Federation to which Jassy belongs, which is readily explainable, since then if you look at the state reports, that at the time of these arrests and escapes, the organization itself was kind of  in support, and then he says the melange of contradiction regarding the number of arrests and escapes. So you take the first one, and girls' testimony, what substantial evidence supports just discounting all of that evidence? In terms of the first arrest, or just the arrests in general? Well, he confirmed Jassy's active support for Khalistan, and the Indian police's harassment of it, and the militants' dislike of him, because their members were killed at his home. He heard the gunshots, I think, in the field of the first of the three incidences. And then he also said that he went back in 1999, and his father said the police were still coming every two to three months to ask about Jassy, and all of these things are sort of classic indications. With regard to the overarching theme that there was police harassment of Mr. Jassy and Ms. Kaur, I think that the immigration judge and the board made clear that none of the harassment was tied to his belief systems in terms of, it wasn't shown that it was tied to his belief systems. Instead, what he testified to and what he admits to, petition to Jassy, is that in each instance there were militant operatives at his home, and that the police had a legitimate interest in understanding where these militants were, whether they were involved in any activities that were illegal, if they were actively carrying weapons, which in each instance there were shootouts, not just from the police, but return fire, and indicating that some policemen were actually killed in the first, in the first and the third raids in particular. So the police have, there's a legitimate and logical explanation for the police to have a reason and a rationale to monitor a situation where members of their police force have been killed on a regular basis, when they attempt to ascertain what is going on in that particular meeting. We don't, there wasn't any testimony as to who shot first or what was the situations in terms of who was the result, or at least the results of the death toll, and they were on both sides, not just one, and in multiple occasions, which would provide a rationale for why the police could be there outside of any political, religious, or racial reasons in order to persecute Mr. Jassy. I realize your time is up, but let me, I just want to ask you one question about the second petition before us, which is on the first one, the motion to reconsider, to reopen based on the adjustment of their labor authorization. Yes. That is, so the BIA, the file of the motion, the BIA rules on it, and the BIA says, well, at the asylum hearing, the IJ found them basically, they were lying, and said, well, so that makes your inadmissible, and you didn't file an application for, what is it called, the waiver of inadmissibility for them. In the meantime, though, they had petitioned for review of the BIA's decision on the credibility finding, which is what we're talking about here. Don't you think it's kind of odd that the BIA would say, well, you didn't file an application for waiver of your inadmissibility, when they're fighting that very determination? That's what I find really troublesome about this whole thing. I understand your question, and the way I see it is that the law of the case at the moment, the law of the case at the moment is that where they filed this motion to reopen was that the petitioners had lied. That was the finding. And according to the BIA, there was a simple way to get them to reconsider reopening by attaching the application that's provided to them in these instances. I think the BIA was thinking that, in just such a circumstance, there's a mechanism to deal with that. Even though you've repealed the credibility determination in another instance, the mechanism is to attach the appropriate application for waiver for that finding. But they didn't know. My point is, did they know that the BIA was going to invoke the prior finding by the IJ as a basis for saying you need an application for waiver of inadmissibility? I would say that that's apparent in the sense that they had filed for the, at the time, if I understand the timing correctly, when they had already filed for a motion to reopen, the BIA had already denied their motion to appeal or return the IJ's determination. But they had a petition for review in front of us. That's right. It's been up for six years or something. Yes. Yes. So it wasn't as settled. Let me ask you, if we did, if we were to grant the second petition and not the first, what situation does that leave your clients in and the petitioners in? The petitioners? Yeah. In that instance, it would go back to the BIA. And they would then be able to put in their evidence on the labor certification, the evidence of the arrests, and all of the other evidence to show that the, I mean, I don't know if they could readdress the adverse credibility. I have to say, I realized that the evidence of the arrests were not in front of the BIA. But would they be able to put them in front of the BIA at this point to demonstrate that, in fact, they were telling the truth? If this court were to grant the second petition in terms of allowing the case to be reopened, or the BIA to reopen the matter, they would be able to, at that point, add in the information as needed. In terms of the new information to reopen, that when the case is reopened, they would be able to. Well, if they got a green card in response to the second petition, does that bar the deportation order entered in the first case? Which we, I don't know what we would do with it, but. This is really a mess. Yeah. Well, if I understand your question, in terms of if they were granted citizenship under another petition, would they be able to do that rubric while this case was still going on with that moot? The only thing we could do, you know, is stay the issuance of a mandate so that the BIA doesn't have their hands on the first case while they're considering the second case. That's the only thing I can think of. If we grant the, if we were, and I'm not sure what's going to happen here, but if the second petition were granted, does that moot the first petition? Because the second petition results in a reopening. Right. Or do we just send everything back, having granted the one, we just send it all back? Right. My understanding is that if, with regard to the second petition, that was a motion to reopen the proceedings, and it included, it's a motion to reopen the proceedings for the credibility determinations, as well as the decision for, the decision where the BIA denied a second motion for reopening. But they're denying the green card in the second, too, aren't they? They're denying the green card, you mean? Yeah. I'm not aware of a work permit. That's what he's after. Right. Yeah. He wasn't denied a work permit as a result of the BIA. They just didn't issue it. Right. Well, I think what he's saying is that the Department of Labor issued a work permit for him on another rubric of laws, and the BIA just didn't enter it into, or didn't take it into account during the time. Right. Okay. Why don't we, it's been very helpful to talk to you about this case, because it is very confusing. And we thank you, and you've been, you're sort of over your time. Yes. Eight minutes. And I'll just ask counsel for petitioners, if you just have a couple comments you want to make. Is there any questions that we asked that you want to respond to? I really don't think so, Your Honor. It's so complicated, I don't know where to begin. You know, it's kind of how I feel when I got this case. If there's just, let me ask you, suppose... Your Honor, the only thing I would say is the adjustment has already been accomplished by the Homeland Security. There is no dispute as to adjustment. Do they have their labor certificates? They have approved labor certification. They have approval on their employer petition, which is I-140. We met with Homeland Security in Sacramento. They looked at all the paperwork. They approved it. They have given him a work permit, so he can work for this employer. But they also have a final order of deportation. That's the hang-up, because there is a letter here. May I give you one copy, Your Honor? Give it to the court, please. It says they don't have jurisdiction. They later on found out, Your Honor. A year later, they gave him a work permit. They found out, sorry, we don't have jurisdiction because this case needs to be reopened. Do you agree that we have jurisdiction to send the whole thing to mediation, whether anybody likes it or not? Your Honor, I would like you to vacate the order and remand it, and even terminate the removal proceeding. I won't vacate the order, but I'll remand it for negotiation. No, Your Honor, you can vacate the BIA order of deportation, and also you have the ability to terminate the removal proceeding so that the ad hoc adjustment by the Homeland Security stands. Counsel, would you make three copies of that and submit it to the clerk? I think there's a copy machine in the library, and we'll take a look at it, unless the government counsel objects. It's a government document. We want to take a look at it before. Yeah. He hasn't seen it yet. I feel like I'm doing cheating evidence. I'll go to mediation from there. Anyway, just take care of this after. We're going to end this. This case will be deemed submitted. We're going to end this session of this court for today, and you can agree on what you want to do about the document and then make copies and give it to the court clerk. Okay? So thank you very much, counsel.
judges: Beezer, Wardlaw, Paez.